JUDGE WOODS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | 19 Civ. _____ ( ___ )  **19 CV 03785** |
| vs. | ECF CASE |
| ONE OR MORE UNKNOWN TRADERS IN THE SECURITIES OF ANADARKO PETROLEUM CORPORATION, | |
| Defendants. | |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS**
***EX PARTE* EMERGENCY APPLICATION FOR AN**
**ORDER TO SHOW CAUSE, ASSET FREEZE, AND OTHER RELIEF**

KEEFE M. BERNSTEIN[*]
bernsteink@sec.gov
B. DAVID FRASER[*]
fraserb@sec.gov
SECURITIES AND EXCHANGE COMMISSION
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
(817) 900-2607

April 29, 2019

[*] Not admitted in SDNY, *pro hac vice* application filed herewith.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... i

I.   PRELIMINARY STATEMENT ................................................................. 1

II.  FACTUAL BACKGROUND ....................................................................... 3

    A.   Chevron's Agreement to Acquire Anadarko ........................................ 3

    B.   Defendants' Suspicious Trading in Anadarko ..................................... 4

III. ARGUMENT ............................................................................................... 6

    A.   The Court Has Jurisdiction ................................................................. 6

        1.   The Court has subject matter jurisdiction over this action ............... 6

        2.   The Court has personal jurisdiction over the defendants ................. 8

    B.   The Court Should Enter an Order Immediately Freezing Assets ................ 8

        1.   The legal standards for an asset freeze ...................................... 8

        2.   There is strong circumstantial evidence of insider trading ................ 9

        3.   Defendants are very likely to dissipate their ill-gotten gains ............. 12

    C.   An Order Requiring Identifying Information Is Necessary to Conduct This Litigation Effectively ............................................................. 15

    D.   An Order Granting Expedited Discovery Is Appropriate ..................... 15

    E.   An Order Permitting Alternative Means of Service Is Appropriate ........ 16

    F.   An Order Should Issue Prohibiting the Alternation or Destruction of Documents and Other Records .......................................................... 17

    G.   A Repatriation Order is Appropriate .................................................. 17

    H.   The Court Should Enter an Order to Show Cause Why a Preliminary Injunction Should Not Be Entered ..................................................... 18

IV.  CONCLUSION ......................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Cornwell v. Credit Suisse Group,*
    729 F. Supp. 2d 620 (S.D.N.Y. 2010) ........................................................ 7

*Dirks v. SEC,*
    463 U.S. 646 (1983) ................................................................................. 10

*Ellsworth Assocs., Inc. v. United States,*
    917 F. Supp. 841 (D.D.C. 1996) ............................................................. 16

*FTC v. Pecon Software, Inc.,*
    *Nos. 12 Civ. 7186, 12 Civ. 7188, 12 Civ. 7191, 12 Civ. 7192, 12 Civ. 7195,*
    2013 WL 4016272 (S.D.N.Y. Aug. 7, 2013) ............................................. 16

*Hecht Co. v. Bowles,*
    321 U.S. 321 (1944) ................................................................................. 9

*In re Gildan Activewear, Inc. Sec. Litig.,*
    636 F. Supp. 2d 261 (S.D.N.Y. 2009) ..................................................... 11

*Int'l Controls Corp. v. Vesco,*
    490 F.2d 1334 (2d Cir. 1974) ................................................................. 9

*Morrison v. Nat'l Austl. Bank Ltd.,*
    561 U.S. 247 (2010) ................................................................................. 6

*Russo v. Bruce,*
    777 F. Supp. 2d 505 (S.D.N.Y. 2011) ..................................................... 11

*SEC v. Aimsi Tech., Inc.,*
    650 F. Supp. 2d 296 (S.D.N.Y. 2009) ..................................................... 18

*SEC v. Aragon Capital Advisors, LLC,*
    2011 WL 3278642 (S.D.N.Y. July 26, 2011) ........................................... 17

*SEC v. Babikian,*
    No. 14 Civ. 1740, 2014 WL 2069348 (S.D.N.Y. Apr. 21, 2014) .............. 16

*SEC v. Banner Fund Int'l,*
    211 F.2d 602 (D.C. Cir. 2000) ........................................................... 17-18

*SEC v. Berger,*
    322 F.3d 187 (2d Cir. 2003) ................................................................... 7

*SEC v. Byers*,
      No. 08 Civ. 7104, (DC), 2009 WL 33434 (S.D.N.Y. Jan. 7, 2009) ............................ 8

*SEC v. Cavanagh*,
      155 F.3d 129 (2d Cir. 1998) ................................................................. 8, 9

*SEC v. Compania Int'l Financiera S.A.*,
      2011 WL 3251813 (S.D.N.Y. July 29, 2011) ................................................. 8, 13, 17

*SEC v. Credit Bancorp Ltd.*,
      No. 99 Civ. 11395, 2010 WL 768944 (S.D.N.Y. March 8, 2010) ............................ 14

*SEC v. Dubovoy*,
      No. 15-CV-06076-MCA-MAH, AH,
      2015 WL 6122261 (D.N.J. Oct. 16, 2015) .................................................... 9, 12

*SEC v. Dubovoy*,
      2016 WL 7217607 (D.N.J. Dec. 13, 2016) .................................................... 16

*SEC v. Estate of Hirshberg*,
      101 F.3d 109 (2d Cir. 1996) ................................................................. 9

*SEC v. Euro Security Fund, COIM SA*,
      No. 98 CIV. 7347, (DLC), 1999 WL 76801 (S.D.N.Y. 1999) .................................. 8

*SEC v. First Jersey Sec., Inc.*,
      101 F.3d 1450 (2d Cir. 1996) ................................................................ 9

*SEC v. Gonzalez de Castilla*,
      145 F. Supp. 2d. 402 (S.D.N.Y. 2001) ....................................................... 13

*SEC v. Grossman*,
      F. Supp. 649 (S.D.N.Y. 1995) ................................................................ 9

*SEC v. Illarramendi*,
      No 1l-civ-78, 2011 WL 2457734 (D. Conn. June 16, 2011) .................................... 17

*SEC v. Lybrand*,
      No. 00-CV-1387, (SHS), 2000 WL 913894 (S.D.N.Y. July 6, 2000) ......................... 17

*SEC v. Maillard*,
      *No. 13-cv-5299,* (VEC), 2014 WL 1660024, 2014 U.S. Dist. LEXIS 56456
      (S.D.N.Y. Apr. 23, 2014) ................................................................... 7-8, 14

*SEC v. Obus*,
      693 F.3d 276, 290 (2d Cir. 2012) ............................................................ 10

*SEC. v. One or More Unknown Traders in Sec. of Bioverativ, Inc.*,

18 CIV. 701 (JGK), 2018 WL 2244463 (S.D.N.Y. Jan. 26, 2018) ................ 2, 12, 14

*SEC v. One of More Purchasers of Call Options for the Common Stock of CNS, Inc.,*
    No. 06-4540 (Oct. 12, 2006) ............................................................................ 14

*SEC. v. One or More Unknown Traders in Sec. of Gen. Commc'n, Inc.,*
    17 CIV. 2659 (KPF), 2017 WL 1407514 (S.D.N.Y. Apr. 13, 2017) ............. 2, 12, 14

*SEC v. One or More Unknown Purchasers of Options of Intermune, Inc.,*
    No. 10-9560 (S.D.N.Y. Dec. 23, 2010) ......................................................... 2, 14

*SEC v. One or More Unknown Traders in Securities of Onyx Pharmaceuticals, Inc.,*
    No. 13–CV–4645 (JPO), 2014 WL 5026153
    (S.D.N.Y. Sept. 29, 2014) ...................................... 2, 10, 11, 12, 13, 14

*SEC v. One or More Unknown Purchasers of Sec. of Telvent GIT, SA,*
    No. 11-CV-3794 (TPG) (S.D.N.Y. June. 3, 2011) ...................................... 2, 14

*SEC v. Payton,*
    97 F. Supp. 3d 558, (S.D.N.Y. 2015) ........................................................... 13

*SEC v. Resource Dev. Int'l LLC,*
    160 F. App'x 368 (5th Cir. Dec. 21, 2005) ................................................... 17

*SEC v. Roazak,*
    495 F. Supp. 2d 875 (N.D. Ill. 2007) ............................................................. 11

*SEC v. Schiffer,*
    No. 97 Civ 5853, (RO), 1998 WL 307375 (S.D.N.Y. June 11, 1998) ..................... 14

*SEC v. Singer,*
    786 F. Supp. 1158 (S.D.N.Y. 1992) ............................................................. 11

*SEC v. Softpoint, Inc.,*
    No. 99 CIV 2951, (GEL), 2001 WL 43611 (S.D.N.Y. Jan. 18, 2001) ....................... 8

*SEC v. Sonja Anticevic, et al.,*
    No. 05 Civ. 6991, (KMW), 2005 WL 1939946 (S.D.N.Y. Aug. 5, 2005) ............... 13

*SEC v. Spivak,*
    194 F. Supp. 3d 145, 161 n.4 (D. Mass. July 12, 2016) ............................. 13

*SEC v. Traffic Monsoon, LLC,*
    245 F. Supp. 3d 1275 (D. Utah 2017) ........................................................... 7

*SEC v. Unifund SAL,*
    910 F.2d 1028 (2d Cir. 1990) ................................................. 8, 9, 12, 16, 17

*SEC v. Vaskevitch,*
   657 F. Supp. 312 (S.D.N.Y. 1987) ............................................................. 16

*SEC v. Warde,*
   151 F.3d 42 (2d Cir. 1998) ....................................................................... 10

*SEC v. Well Advantage Ltd., et al.,*
   No. 12-cv-5786 (RJS), (S.D.N.Y. Aug. 6 & 22, 2012)......................................13

*SEC v. Xia,*
   No. 15 Civ. 03320 (S.D.N.Y. May 5, 2015)........................................................14

*Smith v. SEC,*
   653 F.3d 121 (2d Cir. 2011) ................................................................... 8, 9

*United States v. Libera,*
   989 F.2d 596 (2d Cir. 1993) ..................................................................... 11

*United States v. Newman,*
   773 F.3d 438 (2d Cir. 2014) ................................................................ 10, 11

*United States v. O'Hagan,*
   521 U.S. 642 (1997) ............................................................................... 11

## FEDERAL STATUTES

Section 929P(b), Dodd-Frank Wall Street Reform and Consumer Protection Act.............. 6, 7

### Securities Exchange Act of 1934

*Section 27* [15 U.S.C. § 78aa] ........................................................................ 6

*Section 10* [15 U.S.C. § 78j] ................................................................... 1, 9, 10

*Section 21* [15 U.S.C. § 78u]............................................................................ 17

## FEDERAL REGULATIONS

Rule 10b-5 [17 C.F.R. § 240.10b-5] ................................................................... 1

Plaintiff Securities and Exchange Commission (the "SEC") respectfully submits this Memorandum of Law in support of its *ex parte* emergency application for an order to show cause, asset freeze, and other relief against One or More Unknown Traders in the Securities of Anadarko Petroleum Corporation (collectively, "Defendants").

## I.    PRELIMINARY STATEMENT

The SEC seeks an emergency asset freeze to prevent the dissipation of proceeds from highly unusual and suspicious insider trading by unknown traders who are believed to be overseas. These unknown traders purchased, in foreign accounts, significant quantities of out-of-the-money call option contracts ("calls") in the securities of Anadarko Petroleum Corporation (NYSE: APC) ("Anadarko")—a security for which the accounts at issue had no recent options trading history—shortly before Chevron announced its intention to acquire Anadarko on April 12, 2019. As a result of their well-timed trades, Defendants stand to earn windfall profits of approximately $2.5 million from options that cost approximately $200,000.

Defendants' identities are not yet known. Their purchase orders originated through foreign brokerage firms, using accounts trading for one or more foreign purchasers. The foreign brokerage firms cleared the trades through U.S.-based brokerage firms.

Despite the unknown identities of these foreign traders, the evidence submitted with this Application, including the Declaration of Jeffrey Cohen ("Cohen Decl.") attached as Exhibit A, demonstrates a strong circumstantial basis to infer that Defendants engaged in illegal insider trading in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Because the Defendants are trading through accounts held at foreign institutions, there is a substantial risk that Defendants' ill-gotten funds will be dissipated if not immediately frozen, and ordered repatriated to the United States to the extent they are overseas.

1

The SEC, therefore, seeks an emergency asset freeze and other related relief, to preserve the status quo and to protect this Court's ability to enter a meaningful judgment of disgorgement, prejudgment interest, and monetary penalties against Defendants.  Specifically, the SEC respectfully requests that the Court enter an order:

(a)   freezing assets;

(b)   requiring Defendants' identification;

(c)   requiring repatriation of any assets;

(d)   preventing document alteration or destruction;

(e)   expediting discovery in this action;

(f)   providing for alternate means of service of the papers supporting this application and any Order the Court issues based on this application; and

(g)   requiring Defendants to show cause why this Court should not issue a preliminary injunction and other relief against them.

Under similar circumstances, courts within this district have previously granted the SEC identical relief as that requested in this Application.  *See, e.g., SEC. v. One or More Unknown Traders in Sec. of Bioverativ, Inc.*, 18 CIV. 701 (JGK), 2018 WL 2244463 (S.D.N.Y. Jan. 26, 2018) (attached as Exhibit B); *SEC. v. One or More Unknown Traders in Sec. of Gen. Commc'n, Inc.*, 17 CIV. 2659 (KPF), 2017 WL 1407514 (S.D.N.Y. Apr. 13, 2017) (attached as Exhibit C); *SEC v. One or More Unknown Traders in Sec. of Onyx Pharm., Inc.*, No. 13- 4645, (S.D.N.Y. July 10, 2013) (attached as Exhibit D); *SEC v. One or More Unknown Purchasers of Sec. of Telvent GIT, SA*, No. 11-CV-3794 (TPG) (S.D.N.Y. June. 3, 2011) (attached as Exhibit E); *SEC v. One or More Unknown Purchasers of Options of Intermune, Inc.*, No. 10-9560 (S.D.N.Y. Dec. 23, 2010) (attached as Exhibit F).

2

## II.   FACTUAL BACKGROUND

### A.   Chevron's Agreement to Acquire Anadarko

On February 6, 2019, Chevron's CEO delivered a letter to Anadarko's CEO setting forth Chevron's proposal to acquire Anadarko. (Cohen Decl. ¶ 14.)  Shortly thereafter, Anadarko informed its board of directors ("Board") of the letter and notified various legal and financial advisors of the proposal. (*Id.*)  On February 18, 2019, Anadarko's Board authorized negotiations with Chevron with respect to a potential transaction. (*Id.*)  On February 20, 2019, Chevron and Anadarko executed a Non-Disclosure Agreement ("NDA") and thereafter began due diligence process. (*Id.*)   On March 11, 2019, Chevron sent a draft merger agreement to Anadarko. (*Id.*)

On March 22, 2019, the CEO of Occidental told the CEO of Anadarko that Occidental would be sending a competing offer to acquire Anadarko. (*Id.* ¶ 15.)  On March 23, 2019, Anadarko received the competing offer from Occidental and informed Chevron that it would consider competing proposals. (*Id.*)   On March 24, 2019, Chevron disengaged from the negotiating process and Anadarko's Board authorized transaction discussions with Occidental. (*Id.*)   On March 26, 2019, Anadarko and Occidental executed an NDA. (*Id.*)  Over the next several days, Anadarko and Occidental engaged in merger discussions and due diligence sessions, including in-person due diligence sessions held on April 1, 2019. (*Id.*)

On April 6, 2019, discussions between Chevron and Anadarko resumed and ran parallel to Anadarko's discussions with Occidental. (*Id.*)   On April 11, 2019, Chevron and Anadarko executed the merger agreement after the market closed. (*Id.*)   Before the U.S. markets opened on April 12, 2019, Anadarko and Chevron publicly announced (the "Announcement") an agreement for Chevron to acquire all of the outstanding shares of Anadarko through a tender offer for approximately $33 billion. (*Id.* ¶ 16.)   Under the terms of the agreement, Chevron

3

would pay $65 per share in cash and stock, a 38% premium over Anadarko's April 11, 2019 closing price of $46.80.  (*Id.* ¶ 17.)

As a result of the Announcement, Anadarko's share price increased substantially.  On April 12, 2018, Anadarko shares opened at $63.07, reached a high of $63.23 for the day, and closed at $61.78, a 32% increase over its April 11 closing price.  (*Id.* ¶ 18)  Between February 6, 2019 and April 11, 2019 (the day before the Announcement), Anadarko traded between $41.84 and $47.19, up to the $46.80 close on April 11, 2019.  (*Id.*)  Following the Announcement, on April 24, 2019, Occidental issued a press release announcing a competing proposal to acquire Anadarko for $76 per share.  (*Id.* ¶ 19.)

**B.    Defendants' Suspicious Trading in Anadarko**

Defendants are unknown traders who purchased options through foreign accounts.  In advance of the Announcement, Defendants purchased 1,650 Anadarko calls through an omnibus account at Cowen International Ltd. in the United Kingdom ("Cowen Account"), a second U.K. omnibus account at Cowen International Ltd. for Sun Global ("Cowen-SG Account"), and an omnibus account in Cyprus at Renaissance Securities (Cyprus) Limited ("Renaissance Account").  (*Id.* ¶ 21.)

The following table summarizes the calls Defendants bought shortly before the April 12, 2019 Announcement:

| Option Series | Bought | Sold | Exercised | Strike Price | % of Series | Profit (less comms) |
|---|---|---|---|---|---|---|
| **Cowen Account** | | | | | | |
| APC 15FEB19 | 2/8/19 250 options | | 2/15/19 250 options | $40 | 55.19% | $494,000 |
| APC 18APR19 | 3/22/19 500 options | 4/16/19 500 options | | $45 | 57.34% | $824,500 |
| **Cowen-SG Account** | | | | | | |
| APC 18APR19 | 3/25/19 250 options | 4/16/19 250 options | | $45 | 34.97% | $419,250 |
| **Renaissance Account** | | | | | | |
| APC 17MAY19 | 4/1/19 650 options | | 4/15/19 650 options | $50 | 38.33% | $727,350 |

(*Id.* ¶ 28.)

Defendants' purchases of the Anadarko calls were highly suspicious for several reasons.

First, substantially all of the calls were purchased out-of-the-money,[1] shortly before the

Announcement, and were set to expire in the near term.  (*Id.* ¶¶ 24-28.)  Therefore, the price of

Anadarko's stock had to rise for Defendants to make money on the calls.[2]

---

[1] If at the time of purchase the strike price for the call is above the price at which the stock is then trading, the call is "out of the money" because it would be unprofitable to exercise the call and pay more for the stock than if it were purchased on a stock market.

[2] The February 8, 2019 calls in the Cowen Account were the only "in-the-money" calls.  However, these calls were purchased only days after the start of Anadarko's acquisition discussions with Chevron.  On information and belief, an individual with inside information about early merger discussions would also be incentivized to acquire in-the-money options, because if an acquisition was not announced before their expiration, the account holder would be able to exercise the options and hold the stock with knowledge that discussions continued.

Second, the purchases began shortly after the discussions between Chevron and Anadarko commenced, and continued during the time that Anadarko and Chevron, and/or Anadarko and Occidental, were actively discussing an acquisition. (*Id.*)

Third, before these suspicious and profitable trades, no other reportable trades in Anadarko options had been placed through the Cowen, Cowen-SG, or Renaissance Accounts in the year leading up to the Announcement. (*Id.* ¶ 29.)

Fourth, the option purchases at issue accounted for a large percentage of the respective option series. (*Id.* ¶¶ 24-28.) Moreover, the trades were not hedged, and Defendants were solely betting the stock price would increase. (*Id.* ¶ 30.)

Fifth, Defendants obtained outsized profits in a short period of time based on a relatively small investment. The traders in the three accounts have generated approximately $2.5 million in short-term profits (or potential profits) from these trades: (1) $1,318,500 in the Cowen Account; (2) $419,250 in the Cowen-SG Account; and (3) $727,350 in the Renaissance Account. (*Id.* ¶ 31.) The total cost of the options was only approximately $200,000. (*Id.* ¶¶ 24-26.)

### III.   ARGUMENT

#### A.   This Court Has Jurisdiction

##### 1.   The Court has subject matter jurisdiction of this matter

The Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because, *inter alia,* Defendants made use of the facilities of a national securities exchange in connection with the transactions alleged in the Complaint. As a threshold matter, the domestic transaction requirement of *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 266-67 (2010), does not apply to this action. Congress reinstated the Second Circuit's "conduct and effects" test in SEC enforcement actions when it enacted Section 929P(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act. *See*

17 U.S.C. § 77v(c) ("The district courts of the United States…shall have jurisdiction of an action or proceeding brought or instituted by the Commission or the United States alleging a violation of section 77q(a) of this title involving--(1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States."); *Cornwell v. Credit Suisse Group*, 729 F. Supp. 2d 620, 627 n.3 (S.D.N.Y. 2010) (Marrero, J.) ("For whatever comfort it may bring to Plaintiffs and counsel, and however much restoration of the Second Circuit's pride and vindication of its venerable jurisprudence it is worth, the Court notes that in legislation recently enacted, Congress explicitly granted federal courts extraterritorial jurisdiction under the conduct or effect test for proceedings brought by the SEC."); *see also SEC v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275, 1286-94 (D. Utah 2017) (concluding that Section 929P(b) of the Dodd-Frank Act reinstated the conduct and effects test).

Under the "conduct and effects" test, the Second Circuit looks to two factors: "(1) whether the wrongful conduct occurred in the United States, and (2) whether the wrongful conduct had a substantial effect in the United States or upon United States citizens." *SEC v. Berger*, 322 F.3d 187, 192 (2d Cir. 2003). "[T]he test is met whenever (1) the defendant's activities in the United States were more than merely preparatory to a securities fraud conducted elsewhere and (2) the activities or culpable failures to act within the United States directly caused the claimed losses." *Id.* at 193 (internal quotation marks and citations omitted). Here, the conduct at issue—the highly suspicious options trades—occurred in the United States and had a substantial effect on United States investors.

7

Even applying *Morrison*, the domestic transaction requirement is satisfied by the domestic securities transactions at issue here. *See, e.g. SEC v. Maillard*, 2014 U.S. Dist. LEXIS 56456 (S.D.N.Y. Apr. 23, 2014); *SEC v. Compania Internacional Financiera S.A.*, 2011 WL 3251813, at *6-7 (S.D.N.Y. July 29, 2011).

### 2.   The Court has personal jurisdiction over the defendants

The Court also has personal jurisdiction over the unknown traders.  A district court may exercise specific personal jurisdiction over a foreign defendant in an action brought under the federal securities laws if the defendant's activities had "an unmistakably foreseeable effect within the United States" and "could reasonably be expected to be visited upon United States shareholders."  *SEC v. Softpoint, Inc.*, No. 99 CIV 2951 (GEL), 2001 WL 43611, at *5 (S.D.N.Y. Jan. 18, 2001) (citing *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990)); *see also SEC v. Euro Security Fund, COIM SA*, No. 98 CIV. 7347 (DLC),  1999 WL 76801, at  *2 (S.D.N.Y. 1999). This requirement is easily met when a foreign defendant buys or sells securities traded exclusively on an exchange located in the United States, because such conduct "creates the near certainty that United States shareholders … would be adversely affected."  *Euro Sec. Fund*, 1999 WL 76801, at *3; *see also Unifund SAL*, 910 F.2d at 1033; *Softpoint*, 2001 WL 43611, at *5 (citations omitted).

### B.   The Court Should Enter an Order Immediately Freezing Assets

### 1.   The legal standards for an asset freeze

In this emergency action, the SEC, who has an obligation to protect public interest, seeks an immediate asset freeze.  Such relief turns, in part, on the showing of at least an inference of securities laws violations. *See, e.g., Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011); *SEC v. Cavanagh*, 155 F.3d 129, 132, 135 (2d Cir. 1998). "An asset freeze is a provisional remedy, the purpose of which is to ensure that, in the event the SEC obtains a judgment, money will be

available to satisfy that judgment." *SEC v. Byers*, No. 08 Civ. 7104 (DC), 2009 WL 33434, at *2 (S.D.N.Y. Jan. 7, 2009).

An asset freeze can ensure "that any of the funds that may become due," such as disgorgement, civil penalty, and prejudgment interest, "can be collected." *Unifund SAL*, 910 F.2d at 1041-42 (freeze order on a brokerage account in an amount equal to the potential disgorgement and civil monetary penalty was appropriate relief). *See also SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996); *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1347 (2d Cir. 1974).

Because the SEC seeks to protect the public interest, the standard for issuing injunctive relief differs from that required for a private party. *Unifund SAL*, 910 F.2d at 1035-36 ("the standards of public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief") (*quoting Hecht Co. v. Bowles*, 321 U.S. 321, 331 (1944)). To obtain an asset freeze at the temporary restraining order or preliminary injunction stage, the SEC need only show "either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." *Smith v. SEC*, 653 F.3d at 128 (internal quotations omitted); *see also SEC v. Dubovoy*, No. 15-CV-06076-MCA-MAH, 2015 WL 6122261 at *6 (D.N.J. Oct. 16, 2015) (citing *Smith*). As a result, this standard is considerably lower than that required in civil litigation between private parties; the SEC does not have to show a risk of irreparable injury. *See Unifund SAL*, 910 F.2d at 1036; *SEC v. Cavanagh*, 155 F.3d at 132. Where a freeze order is appropriate, a court may freeze any available assets, including assets not traceable to the fraud. *SEC v. Grossman*, 887 F. Supp. 649, 661 (S.D.N.Y. 1995), *aff'd*, *SEC v. Estate of Hirshberg*, 101 F.3d 109 (2d Cir. 1996).

### 2.    There is strong circumstantial evidence of insider trading

This Application presents strong circumstantial evidence that Defendants engaged in

9

insider trading in Anadarko options. Section 10(b) of the Exchange Act prohibits insider trading. *United States v. Newman,* 773 F.3d 438, 445 (2d Cir. 2014). A person is liable under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder for illegal insider trading when he obtains material,[3] nonpublic information intended to be used only for a proper purpose, and then misappropriates or otherwise misuses that information in breach of a fiduciary duty, or other duty arising out of a relationship of trust and confidence, to make "secret profits" by trading or tipping others. *Dirks v. SEC,* 463 U.S. 646, 654 (1983).

Both tippers and tippees can be liable for insider trading. "A tipper is liable for insider trading if she has a duty to keep material nonpublic information confidential, she tips someone who could use the information in connection with securities trading, and she personally benefits from giving the tip. By secretly exploiting material nonpublic information for personal gain, the tipper deceptively breaches her duty to shareholders (classical theory) or her source (misappropriation theory), violating § 10(b)." *SEC v. One or More Unknown Traders in Securities of Onyx Pharmaceuticals, Inc.,* No. 13–CV–4645 (JPO), 2014 WL 5026153, at *5 (S.D.N.Y. Sept. 29, 2014) (citing *Obus,* 693 F.3d at 286, 289).

Assuming that the tipper has breached a duty, a tippee may be liable under the classical or misappropriation theory. A tippee is liable for classical insider trading where:

> (1) the corporate insider was entrusted with a fiduciary duty; (2) the corporate insider breached his fiduciary duty by (a) disclosing confidential information to a tippee (b) in exchange for a personal benefit; (3) the tippee knew of the tipper's breach, that is, he knew the information was confidential and divulged for personal benefit; and (4) the tippee still used that information to trade in a security or tip another individual for personal benefit.

---

[3] Nonpublic information about an acquisition is plainly material, especially in light of a stock price increase once the information becomes public. *See, e.g., SEC v. Obus,* 693 F.3d 276, 290 n.3 (2d Cir. 2012) ("Unannounced acquisitions are a prototypical example of material non-public information."); *SEC v. Warde,* 151 F.3d 42, 47 (2d Cir. 1998) (holding that materiality was "confirmed by the fact that the stock price jumped when [the] information was made public").

*United States v. Newman*, 773 F.3d 438, 445 (2d Cir. 2014).

Alternatively, a tippee may be liable under a misappropriation theory. "An alternative, but overlapping, theory of insider trading liability, commonly called the 'misappropriation' theory, expands the scope of insider trading liability to certain other 'outsiders,' who do not have any fiduciary or other relationship to a corporation or its shareholders." *Id.* at 445. "Liability may attach where an 'outsider' possesses material non-public information about a corporation and another person uses that information to trade in breach of a duty owed to the owner." *Id.* at 445-46 (citing *United States v. O'Hagan*, 521 U.S. 642, 652-53 (1997)); *United States v. Libera*, 989 F.2d 596, 599-600 (2d Cir. 1993)).

Courts routinely find an inference of insider trading when unusual and suspicious trading is present. A trade is "unusual," if made "in amounts dramatically out of line with prior trading practices and at times calculated to maximize personal benefit from undisclosed inside information." *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) (quotation omitted). The inquiry is highly context-specific. *Russo v. Bruce*, 777 F. Supp. 2d 505, 517 (S.D.N.Y. 2011). Furthermore, "[p]roof of insider trading can well be made through an inference from circumstantial evidence and not solely upon a direct testimonial confession." *SEC v. Singer*, 786 F. Supp. 1158, 1164 (S.D.N.Y. 1992); *see also SEC v. Roazak*, 495 F. Supp. 2d 875, 887-89 (N.D. Ill. 2007) (collecting cases holding that "the SEC is entitled to prove its case through circumstantial evidence.").

The evidence here raises a strong inference that Defendants have violated the insider trading laws, given the highly suspicious nature of the timing, size, and profitability of these trades. As discussed above, in advance of the Announcement, Defendants purchased 1,650 Anadarko calls. These calls, with limited exception: (a) were purchased out-of-the-money and

11

shortly before the Announcement; (b) were set to expire in the near term; (c) were purchased while acquisition discussions were active and at times aligned with key events in those discussions; (d) represented a large percentage of the respective option series; and (e) resulted in, or are in a position to result in, windfall profits.  Further, reports from another industry regulator show (f) no Anadarko hedging in the accounts and (g) no other reportable Anadarko options trading in the accounts during the preceding year.

All of these facts provide a more than sufficient basis for an emergency asset freeze.  The fact that the SEC has not identified the traders does not, at this early stage in the litigation, undermine the validity of the SEC's claims.  *See, e.g., SEC v. One or More Unknown Traders in Sec. of Bioverativ, Inc.*, 2018 WL 2244463; *SEC v. One or More Unknown Traders in Sec. of Gen. Commc'n, Inc.*, 2017 WL 1407514; *SEC v. One or More Unknown Traders in Sec. of Onyx Pharm., Inc.*, 2014 WL 5026153 (Attached as <u>Exhibits B-D</u>.)

### 3.     Defendants are very likely to dissipate their ill-gotten gains

The evidence of insider trading in the subject accounts, combined with the dissipation risk, demonstrates a strong basis for an asset freeze.  Asset freeze orders are "less burdensome on defendants than other types of injunctive relief; for that reason, the required showing of success on the merits (or a permissible inference) is lower, especially if the freeze order is limited in duration."  *Onyx*, 2014 WL 5026153, at *8.  In determining the necessity for a freeze, the Court may "factor the concern that defendants will dissipate their assets or transfer them beyond the jurisdiction of the United States."  *SEC v. Dubovoy*, 2015 WL 6122261, at *3 (D.N.J. Oct. 16, 2015) (renewing asset freeze at preliminary injunction, noting that "the fact that [the defendant who] controls the foreign entities, lives abroad raises a serious concern that he may transfer corporate funds beyond the Court's jurisdiction and dissipate the assets available for any eventual award").

In *Unifund SAL*, the Second Circuit found that a freeze order was appropriate where there was a basis to infer insider trading, even when there was insufficient evidence to prove all of the elements at the pre-trial stage, and noted:

> There is a basis to infer that the appellants traded on inside information, and while the Commission is endeavoring to prove at trial the requisite element of trading in breach of a fiduciary duty of which the defendants were or should have been aware, the Commission should be able to preserve its opportunity to collect funds that may yet be ordered disgorged.

910 F.2d at 1041; *see also SEC v. Spivak*, 194 F. Supp. 3d 145, 161 n.4 (D. Mass. July 12, 2016) (noting decisions holding that "if a tip took place under circumstances known only to the defendant and the tipper, the plaintiff may plead a belief about the content and the circumstances of the tip, coupled with particular facts supporting that belief"), citing *Onyx*, 2014 WL 5026153, at *4); *accord SEC v. Payton*, 97 F. Supp. 3d 558, 563 n.3 (S.D.N.Y. 2015).

An asset freeze is particularly appropriate here given the clear risk of imminent asset dissipation, especially considering that the Defendants are likely foreigners. *See, e.g., SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d. 402, 420 (S.D.N.Y. 2001) (defendant's "status as a citizen and resident of Mexico with accounts at Mexican banks raises a danger that the funds would be dissipated or transferred beyond this Court's jurisdiction if his account did not remain frozen."); *SEC v. Sonja Anticevic, et al.*, No. 05 Civ. 6991 (KMW), 2005 WL 1939946 (S.D.N.Y. Aug. 5, 2005) (freezing the assets of a foreign citizen to avoid dissipation of assets); *SEC v. Well Advantage Ltd., et al.*, No. 12-cv-5786 (RJS), Docket Nos. 15, 35 (S.D.N.Y. Aug. 6 & 22, 2012) (freezing the assets of a foreign citizen to avoid dissipation of assets).

Courts in this district and elsewhere routinely grant asset freezes under similar circumstances. *See, e.g., Compania Internacional Financiera S.A.*, 2011 WL 3251813, at *8-13 (granting asset freeze and noting that "on its own, [defendant]'s suspicious trading activity

13

provides an inference of insider trading without any assumption that [his] activities were coordinated with or connected to the trading by [co-defendants]"); *SEC v. Xia*, No. 15 Civ. 03320 (S.D.N.Y. May 5, 2015) (granting emergency asset freeze based on suspicious trading); *SEC v. One of More Purchasers of Call Options for the Common Stock of CNS, Inc.*, No. 06-4540 (Oct. 12, 2006) (granting emergency asset freeze over foreign-held accounts that traded suspiciously in advance of acquisition); *SEC v. One or More Unknown Traders in Sec. of Bioverativ, Inc.*, 18 CIV. 701 (JGK), 2018 WL 2244463 (attached as Exhibit B); *SEC v. One or More Unknown Traders in Sec. of Gen. Commc'n, Inc.*, 17 CIV. 2659 (KPF), 2017 WL 1407514 (attached as Exhibit C); *SEC v. One or More Unknown Traders in Sec. of Onyx Pharm., Inc.*, No. 13- 4645, (S.D.N.Y. July 10, 2013) (attached as Exhibit D); *SEC v. One or More Unknown Purchasers of Sec. of Telvent GIT, SA,* No. 11-CV-3794 (TPG) (S.D.N.Y. June. 3, 2011) (attached as Exhibit E); *SEC v. One or More Unknown Purchasers of Options of Intermune, Inc.*, No. 10-9560 (S.D.N.Y. Dec. 23, 2010) (attached as Exhibit F).

Moreover, asset freezes are not limited to the profits of a fraud—rather, they are designed to preserve enough assets to satisfy the full monetary relief the SEC may seek at the end of the case.  This includes disgorgement and civil penalties.  *See SEC v. Maillard*, No. 13-cv-5299 (VEC), 2014 WL 1660024, at *4 (S.D.N.Y. April 23, 2014); *SEC v. Credit Bancorp Ltd.*, No. 99 Civ. 11395, 2010 WL 768944, at *3 (S.D.N.Y. March 8, 2010).  And the freeze order should preserve the "maximum" or "complete" amounts that the SEC might ultimately obtain.  *SEC v. Schiffer*, No. 97 Civ. 5853(RO), 1998 WL 307375, at *7 (S.D.N.Y. June 11, 1998).

As demonstrated above, an emergency asset freeze is appropriate because of the serious risk that the substantial proceeds of the Defendants' trading will soon move beyond the jurisdiction of U.S. courts and may never be recovered.  The account holder in the Renaissance

Account has requested the clearing broker to transfer Anadarko securities overseas, and the account holder in the Cowen Account has already transferred Anadarko securities from the clearing broker to a different brokerage firm and requested the transfer of additional securities. (Cohen Decl., ¶¶ 24, 26.)  Without immediate action, it is likely that these shares and the proceeds of the option sales will be transferred outside of the United States.

Because the accounts at issue are foreign accounts controlled by people who either recently have transferred, or are expected to transfer, the proceeds of the trading abroad, and because of the highly suspicious nature of the trading, there are ample grounds for granting an asset freeze in this case.  As cited above, courts have repeatedly granted the SEC's preliminary asset freeze applications under similar circumstances.

### C.    An Order Requiring Identifying Information Is Necessary To Conduct This Litigation Effectively

The SEC also seeks an order requiring each Defendant to promptly submit identifying information to this Court and the SEC, including (a) Defendant's name, all business and residence addresses, postal box numbers, telephone numbers, facsimile numbers, e-mail addresses, and nationality; and (b) a listing of each account with any financial institution or brokerage firm maintained by the Defendant or for Defendant's direct and indirect beneficial interest.  Such identifying information will assist the SEC in pursuing discovery and in effectuating the asset freeze, and will ensure that the SEC is able to effect service in a manner most likely to provide prompt actual notice.

### D.    An Order Granting Expedited Discovery Is Appropriate

The SEC also requests that it be permitted to immediately commence limited discovery in this matter, including discovery pursuant to Federal Rules of Civil Procedure 30, 33, 34, 36, and 45.  The power to order such expedited discovery is clearly within the Court's broad

15

authority to regulate discovery, *see* FED. R. CIV. P. 26(D)(L), as well as its equitable power to order all necessary ancillary relief. "Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 844 (D.D.C. 1996) (citing cases). And Courts routinely authorize expedited discovery in matters such as these. *See e.g., Unifund SAL*, 910 F.2d at 1030 (noting the district court's order of expedited discovery); *SEC v. Vaskevitch*, 657 F. Supp. 312, 313 (S.D.N.Y. 1987) (same).

### E.    An Order Permitting Alternative Means of Service Is Necessary

In addition, the SEC requests authorization to serve the Defendants with all of the documents supporting its *ex parte* application via the brokers who cleared the trades on behalf of the customers, and by electronic mail. This will ensure that Defendants obtain prompt notice of this application. Indeed, even for more formal service of the Complaint and Summons, Rule 4(f)(3) of the Federal Rules of Civil Procedure provides that the Court may authorize alternative means to effect service of process. *See Unifund SAL*, 910 F.2d at 1033 (service on foreign investor was proper where the papers were delivered to investor's broker, which forwarded the papers to foreign country where they were received by the investor); *SEC v. Dubovoy*, 2016 WL 7217607 (D.N.J. Dec. 13, 2016) (permitting service by email and through a broker on insider trading defendants located in Russia); *SEC v. Babikian*, No. 14 Civ. 1740, 2014 WL 2069348 (S.D.N.Y. Apr. 21, 2014) (order noting that the Court had "permitted alternative service of process on [defendant] via email" for Canadian citizen whose whereabouts were unknown); *FTC v. Pecon Software, Inc.*, Nos. 12 Civ. 7186, 12 Civ. 7188, 12 Civ. 7191, 12 Civ. 7192, 12 Civ. 7195, 2013 WL 4016272, at *5 (S.D.N.Y. Aug. 7, 2013) ("Service by email alone comports with due process where a plaintiff demonstrates that the email is likely to reach the defendant.") (citations omitted).

16

**F.    An Order Should Issue Prohibiting the Alteration or Destruction of Documents and Other Records**

In order to protect all documents necessary for full discovery in this matter, the SEC also seeks an order preventing the alteration or destruction of documents. Such orders are routinely granted to protect the integrity of the litigation. *See, e.g., Unifund SAL*, 910 F.2d at 1040, n.11; *SEC v. Lybrand*, No. 00-CV-1387 (SHS), 2000 WL 913894 at *12 (S.D.N.Y. July 6, 2000) ("an order barring the alteration or destruction of documents is also appropriate").

**G.    A Repatriation Order Is Appropriate**

Finally, the SEC seeks a repatriation order requiring the Defendants to return all trading proceeds that may be located outside this Court's jurisdiction to identified accounts in the United States. Section 21(d)(5) of the Exchange Act authorizes the Court to grant equitable relief "that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). Under this provision, courts routinely order defendants (and relief defendants) to repatriate illicit profits that they have moved abroad, usually to help effectuate an asset freeze. *See, e.g., SEC v. Compania Internacional Financiera S.A.*, 2011 WL 3251813, at *13 (finding an order to repatriate or transfer assets to the U.S. was warranted even where there was no evidence that ill-gotten funds ever resided in the U.S.); *SEC v. Aragon Capital Advisors, LLC*, 2011 WL 3278642, at *10 (S.D.N.Y. July 26, 2011) (finding that a repatriation order was warranted where a relief defendant received ill-gotten gains while she was living overseas).

Such equitable relief is appropriate where the SEC seeks disgorgement in its prayer for relief. *SEC v. Illarramendi*, No 11-civ-78, 2011 WL 2457734, at *7 (D. Conn. June 16, 2011). Courts frequently enter repatriation orders to enforce freeze orders of assets held abroad. *See SEC v. Resource Dev. Int'l LLC*, 160 F. App'x 368 (5th Cir. Dec. 21, 2005) (affirming asset freeze and repatriation order); *SEC v. Banner Fund Int'l*, 211 F.3d 602 (D.C.

17

Cir. 2000); *SEC v. Aimsi Tech., Inc.*, 650 F. Supp. 2d 296 (S.D.N.Y. 2009).   Such an order is

appropriate here.   Repatriation is needed to effectuate the asset freeze, in the event any proceeds

from the trades have already been transferred out of the United States.

> **H.    The Court Should Enter an Order to Show Cause Why a Preliminary Injunction Should Not Be Entered**

The continuation of any relief obtained pursuant to this Application, and the consequent

preservation of the *status quo,* is dependent upon the Court's entry of a preliminary injunction

within fourteen days.   FED. R. CIV. P. 65(b)(2).   Accordingly, the SEC requests that the Court

enter an order requiring Defendants to show cause why a preliminary injunction imposing the

same relief as set forth in the temporary restraining order should not be entered.

## IV.    CONCLUSION

For the foregoing reasons, and those set forth in the accompanying declarations, the

SEC respectfully requests that the Court issue the relief set forth in the order submitted with

this motion.

Dated:  April 29, 2019                                   Respectfully submitted,

                                                         KEEFE M. BERNSTEIN*
                                                         bernsteink@sec.gov
                                                         B. DAVID FRASER*
                                                         fraserb@sec.gov
                                                         SECURITIES AND EXCHANGE
                                                         COMMISSION
                                                         801 Cherry Street, Suite 1900
                                                         Fort Worth, Texas 76102
                                                         (817) 900-2607

                                                         *Counsel for Plaintiff*
                                                         *Securities and Exchange Commission*

* Not admitted in SDNY, *pro hac vice* application filed herewith